OPINION
Defendant-Appellant Charles J. Ward ("Ward") was indicted for one count of aggravated vehicular homicide and two counts of aggravated vehicular assault following a collision on July 15, 1998. Between 9:00 and 10:00 P.M., the city of Dayton Water and Sewer Department were called out to investigate a possible problem on Huffman Drive that was causing sewage to back up into the home at the corner of Huffman and Gondert. While the three city workers were behind their truck working on the manhole, Ward struck them with his van, pinning two of the workers between his van and the city truck. One worker died instantly, the other two were seriously injured. A jury found Ward guilty of all three counts against him and he was sentenced to three years for the aggravated vehicular homicide, and fifteen months each for the aggravated vehicular assaults, all sentences to be served concurrently. Ward appeals this judgment raising the following assignments of error:
 I. The trial court committed prejudicial error by denying Defendant's motion to compel the disclosure of evidence being suppressed by the State. (Tr. 6-11, Entry filed 9/29/99.)
 II. The trial court committed prejudicial error by incorrectly answering a question from the jury. (Tr. 1205-1207, Court Exhibit II.)
 III. The trial court committed prejudicial error by failing to grant Defendant's two motions for a mistrial made during the prosecutor's inflammatory closing argument. (Tr. 1170-1174.)
 IV. Defendant was denied a fair trial by prosecutorial misconduct prevalent throughout the trial, including closing argument. (Tr. 700-705, 1137-1177.)
 V. The jury verdict should be reversed because it is against the manifest weight of the evidence. (Tr. 1210-1215.)
 I
In his first assignment of error, Ward argues that the trial court erred in denying his motion to compel a videotape created by the prosecution. The videotape in question constituted an attempt by the prosecution to recreate the accident at the scene less than a week before trial. According to the prosecutor, if the taping had been successful, she may have used it as evidence at trial. However, due to inadequate equipment, she determined that the taping was not useful and therefore abandoned the project. After learning of this attempted recreation, defense counsel requested copies of the videotape. The prosecutor refused, claiming that the project was abandoned due to inadequacy and would not be used as evidence, and it additionally was protected under the work product exception.
On the first day of trial, defense counsel raised an oral motion in chambers for the court to order the state to release the videotape. After completing an in camera inspection of the tape, the court agreed that it did not accurately and correctly reflect the scene due to inadequate equipment. For this reason and because it was protected under the work product doctrine, the court did not require the state to disclose it.
Crim.R. 16(A)(1)(c) requires the state to disclose the following items to the defense:
 books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant.
(Emphasis added.) Initially, we note that the state had no intention of using the tape at trial, as it abandoned the project prior to making a final product. If the state did not intend to use it, there was no duty to disclose it to the defense. See State v. Lewis (July 21, 2000), Clark App. No. 99-CA-0079, unreported, at p. 2; State v. Hansard (June 15, 1989), Cuyahoga App. No. 53882, unreported, at p. 4. The only exception would be if the evidence was exculpatory to the defendant. See Crim.R. 16(B)(1)(c) and (f).
In regard to the work product doctrine, Crim.R. 16(B)(2) provides:
 Except as provided in subsections (B)(1)(a), (b), (d), (f), and (g), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents.
When discussing this rule, we have previously found that "the work-product doctrine `is reflected * * * in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways.'" (Emphasis added.) State v. Today's Bookstore, Inc. (1993), 86 Ohio App.3d 810, 820
(citations omitted). Although the above rule applies the work product doctrine to criminal cases, it also allows for several exceptions, including evidence favorable to the defendant. This exception is found in Crim.R. 16(B)(1)(f), which provides all evidence "favorable to the defendant and material either to guilt or punishment," shall be disclosed. As discussed below, we do not find that the videotape contains evidence at all. But even if it did, any evidence would be immaterial to Ward's case.
Evidence is material if "there is a reasonable probability, not a mere possibility, that the evidence would alter the outcome of the proceeding." Today's Bookstore, supra, at p. 821, citing United States v. Bagley (1985), 473 U.S. 667; State v. Johnston (1988), 39 Ohio St.3d 48. "The prosecutor has no duty to disclose evidence that might improperly influence the jury and affect the verdict." Id.
After viewing the videotapes, we agree with the trial court that the equipment was not adequate to depict the scene on the night of the collision. First, portions of the videotape were unfocused, completely distorting the view. Second, there are many factors that could differ from the night of the collision, such as lighting, the location of parked cars, and other distractions. More importantly, during the prosecutor's recreation, there was a vehicle parked off to the side of the road at the beginning of their route with headlights flashing and a strobe light circling on the top. This light was very distracting and may have distorted the actual view that Ward would have had that night. Furthermore, each attempt demonstrated on the video depicted the city truck with its strobe light and arrow board flashing, which the defense contends did not occur. In any event, in the video, the truck could be seen from the starting point in each trial run performed by the prosecutor. As a result, it is clear to this court that the videotape is not only immaterial, but also not favorable to Ward and therefore not discoverable. Accordingly, Ward's first assignment of error is overruled.
 II
While the jury was deliberating, they submitted the following question to the court:
 The sixth full paragraph on page 6 of the jury instructions explains that the State is not required to prove that the negligence was the sole cause of death, but rather a cause of death. Does this language also pertain to the causation element under the recklessness count?
(Emphasis sic.) The defense argued the answer should be a simple "no," whereas the state countered it should be a simple "yes." After much discussion with counsel, but without the agreement of the defense, the court answered:
 If death resulted from any other cause, or there is a reasonable doubt as to the alleged unlawful act being a proximate cause of death, the jury should find the Defendant not guilty of Aggravated Vehicular Homicide. You should consider this answer in conjunction with all other instructions given.
Ward contends this answer was improper. We disagree.
When reviewing a trial court's answer to a jury question posed during deliberation, we employ an abuse of discretion standard. State v. Carter (1995), 72 Ohio St.3d 545, 553. This court will not reverse the trial court's decision unless its abuse of discretion has materially prejudiced the defendant. State v. Long (1978), 53 Ohio St.2d 91, 98.
The question posed by the jury basically asked if the state only had to prove that Ward's recklessness was a cause of death in order to find him guilty of aggravated vehicular homicide. In a somewhat indirect way, the court answered yes to that question. A defendant cannot escape criminal liability merely because factors other than his actions contributed to the death or injury to the victims, unless the other factors were the sole proximate cause. State v. Flanek (Sept. 2, 1993), Cuyahoga App. No. 63308, unreported, at p. 7. More specifically, a "contributory negligence" defense cannot be used in a prosecution for vehicular homicide unless the defense can prove that the negligence of the victim was the sole proximate cause of the death. State v. Langenkamp (May 3, 2000), Mercer App. No. 10-99-08, unreported, at p. 5. In other words, as long as the state can prove the defendant's actions were a cause of the death, it is irrelevant whether there were any other contributory causes. This same principle is true for aggravated vehicular homicide, as stated in the trial court's response to the jury question. Flanek, supra.
Because the defense produced evidence that the victims were negligent in failing to properly illuminate the work area, the jury had to decide whether the victims' negligence, if believed, was the sole proximate cause of the collision. If the jury had decided the victims were negligent and that negligence was the sole proximate cause of the collision, then they would have been required to acquit Ward. This is precisely what the trial court's response to the first question conveyed to the jury. Although the first sentence of the response, "[i]f death resulted from any other cause," may have been a little misleading and prejudicial to the State, the remainder of the answer was accurate and not prejudicial to either party. Based on the foregoing, we find that the trial court did not abuse its discretion answering the jury's question. Accordingly, Ward's second assignment of error is overruled.
 III
In his third assignment of error, Ward alleges that the trial court erred in denying his motion for mistrial following inflammatory statements by the prosecutor during her closing argument. When determining whether the trial court's decision on a motion for mistrial was proper, great deference is given to the trial court's discretion, "in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." State v. Stanley (1997), 121 Ohio App.3d 673, 699, citing State v. Glover (1988), 35 Ohio St.3d 18, 19. The appellate court may not reverse the trial court's decision unless it abused its discretion to the extent that the defendant was materially prejudiced. Id.
Ward's motions for mistrial were based on the prosecutor's reference to an inadmissible statement from Ward's wife, and her admonishing the defense for failing to call a witness. Initially, we recognize that improper prosecutorial comments amount to misconduct only if they prejudicially affected the substantial rights of the accused. State v. Hairston (June 11, 1999), Montgomery App. No. 17218, unreported, at p. 3, citing State v. Lott (1990), 51 Ohio St.3d 160, 165. Prosecutorial misconduct should only result in a mistrial if, after a curative instruction, the effect of the comments would still result in a miscarriage of justice. State v. Gardner (1998), 127 Ohio App.3d 538,540.
In regard to Ward's first contention, we agree that counsel may not comment on inadmissible evidence during the closing argument or make comments which are intended to get excluded evidence before the jury. Villella v. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 45, modified on different grounds, Moskovitz v. Mt. Sinai Medical Center (1994),69 Ohio St.3d 638, 639. Ward claims that the following statement made by the prosecutor during closing argument was misconduct: "Do you want to believe Linda Ward, because we brought you a statement that was identified by Heather that Linda . . ." At that moment, the defense attorney objected because Linda's statement had not been introduced into evidence. The trial court sustained the objection and instructed the jury to disregard the prosecutor's question. However, the statement had been identified by Heather, Ward's niece, because she was present when Linda completed the statement. We cannot speculate about what the prosecutor may have said if the defense attorney had not objected at that point, but the record only reflects that Linda made a statement that was identified by Heather. The attempted question, by itself, certainly does not amount to misconduct and therefore is not a ground for a mistrial.
Second, Ward argues that the prosecutor improperly commented that the defense failed to call a specific witness at trial. We disagree that this was improper. The prosecution may comment that a witness other than the accused did not testify, because they are permitted to argue that the defense failed to present evidence to support its case. State v. Clemons (1998), 82 Ohio St.3d 438, 452 (citations omitted).
Because neither of the comments Ward complained of amounted to misconduct, and thus, did not result in a miscarriage of justice, the trial court did not abuse its discretion in overruling his motions for mistrial. Accordingly, Ward's third assignment of error is overruled.
 IV
Ward's fourth assignment of error also confronts the issue of prosecutorial misconduct. He alleges that misconduct permeated the trial and as a result, his conviction should be reversed. Specifically, Ward discusses four instances where he argues that the prosecutor's actions surpassed the level required for misconduct: (1) refusing to approach the bench for a sidebar conference; (2) attempting to introduce Linda Ward's statement and mentioning it again in closing; (3) referring to the defense theory several times as one of deception; and (4) referring to the defense experts in a derogatory and unprofessional manner.
As mentioned earlier, comments by the prosecutor are considered misconduct only if they were improper and prejudicially affected the substantial rights of the defendant. Hairston, supra. "A conviction will be reversed only where it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would not have found the defendant guilty." Id., citing State v. Benge (1996), 75 Ohio St.3d 136, 141. This court must examine the entire record, not just the specific statements, in making this determination. State v. Myers (Feb. 12, 1999), Greene App. No. 96 CA 38, unreported, at p. 14, citing United States v. Hastings (1983), 461 U.S. 499, 509.
Ward first argues the prosecutor's failure to approach the bench for a sidebar was prosecutorial misconduct. We disagree. First, she did not refuse to approach the bench as Ward claims. The defense asked to approach and the court agreed, but advised the prosecutor she did not have to come if she did not want to. Also, even if she had refused to approach the bench, this would not be detrimental to Ward, but would reflect negatively on the State that its representative was disrespectful to the court. In any event, it did not prejudice Ward's rights and therefore, did not constitute misconduct.
Second, Ward alleges that the prosecutor improperly attempted to introduce his wife, Linda Ward's statement, and then referred to it again during closing argument. In this regard, a prosecutor's attempt to introduce inadmissible evidence is not necessarily prosecutorial misconduct. State v. Cook (June 29, 1994), Montgomery App. No. 14013, unreported, at p. 2. Instead, there must also be a breach of some duty by the prosecutor and a resulting substantial prejudice to the defendant's right to a fair trial. Id. The state elicited testimony from Ward's niece that both she and Mrs. Ward gave statements to the police. Her testimony further reflected that "we" did not think he should be driving that night, and "we" tried to talk him out of leaving, clearly referring to Mrs. Ward and herself. Even if Mrs. Ward's statement had been admissible, it would have been cumulative of the testimony given by his niece. Furthermore, following Ward's objection, the trial court gave a curative instruction to the jury. It is presumed that the jury follows all of the court's instructions. State v. Fears (1999), 86 Ohio St.3d 329,334. Accordingly, we do not find that the state's attempted introduction of this statement prejudiced Ward's right to a fair trial.
Ward's final two allegations of prosecutorial misconduct involve the prosecutor's criticism of the defense experts and the whole defense case. Yet the defense counsel did not object to any of the prosecutor's comments complained of regarding these two issues. As a result, these errors have not been reserved for appellate review and will only be sustained upon a showing of plain error. State v. Goodwin (1999),84 Ohio St.3d 331, 339. Plain error only exists if the outcome of the trial would have clearly been different if the error did not occur. State v. Mundy (1994), 99 Ohio App.3d 275, 300, citing State v. Underwood (1983), 3 Ohio St.3d 12.
The prosecutor mentioned the defense experts and their testimony several times during her closing argument. She discussed how they "looked good" and must get paid good money based on their clothes, hair and "manicures." More significantly, she referred to them as "so-called experts" and to their testimony as "foolishness," "bullshit" and "mak[ing] an ass of you and me." We find these remarks entirely unprofessional. Although prosecutors may use "colorful and creative" comments, State v. Lundgren (1995), 73 Ohio St.3d 474, 488, they "should refrain from characterizing defense witnesses as untruthful and attempting to appeal to the passion and prejudice of the jury[.]" State v. Jordan (Apr. 29, 1999), Cuyahoga App. No. 73453, unreported, at p. 20. When the language used by the prosecutor implies dishonesty, particularly in such a crude manner, it results in an inflammatory attack that does not belong in a fair trial. State v. Mundy (1994),99 Ohio App.3d 275, 303. Nonetheless, when viewing the entire argument, we do not find that the prosecutor's comments in this case were sufficient to reach the standard for either prosecutorial misconduct or plain error.
Similarly, we reprimand the prosecutor for continuously characterizing the defense theory as one of deception. While a prosecutor may urge the jury to give little or no weight to the defense's case, State v. Smith (1997), 80 Ohio St.3d 89, 111, attempts by the prosecutor to persuade the jury that the defense is trying to mislead them is improper. State v. Bey (1999), 85 Ohio St.3d 487, 494. However, even if these comments were improper, Ward has failed to demonstrate that he was prejudiced by the remarks.
Based on the foregoing, we find that the comments made by the prosecutor, though inappropriate, did not reach the level of prosecutorial misconduct or plain error. We do not find the outcome of the trial would clearly have been different if the statements had not been made. Accordingly, Ward's fourth assignment of error is overruled.
 V
Finally, Ward alleges the jury's verdict was against the manifest weight of the evidence. When reviewing a manifest weight claim, the appellate court "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387. A verdict should only be overturned in extraordinary situations when evidence weighs heavily against the conviction. Id.
On July 15, 1998, the city of Dayton Water and Sewer Department was contacted to investigate a potential sewage back-up at the home of Kathy and Edward Simpson. Once the crew of three arrived on the scene, they backed the truck up to the manhole in front of the Simpson home. The driver of the sewer truck and supervisor of the crew, Garrett Lockett, testified at trial that it is custom to back the sewer truck right up to the manhole so that the light on the truck can shine down into the hole, and the equipment is within reach. He did this on July 15, 1998. After the truck was backed up, another worker, Karla Bush, placed the only two cones out to form an angle beginning about twenty feet behind the truck, to guide traffic around, and to create a safety zone to work in. Testimony revealed that three cones are usually preferred, but only two were available on the truck that evening.
The third worker, Thomas Hartley, was standing directly over the manhole feeding the tube down into the hole with the other workers on either side of him when the collision occurred. A van driven by Ward collided with the back of the sewer truck, pinning Thomas Hartley and Karla Bush between the two vehicles, and throwing Garrett Lockett several feet. Thomas Hartley died instantly from his injuries, and Karla Bush received severe injuries to her leg. Despite his injuries, Garrett Lockett was able to get up and walk after the accident. When he returned to the back of the truck and saw his co-workers pinned, he began yelling hysterically at Ward to back up his van, who was standing beside his van looking at the victims.
Some witnesses at the scene testified that Ward had bloodshot, glassy eyes and was staggering. A police officer testified that he had a strong odor of alcohol, so he performed an alphabet test and a horizontal gaze nystagmus test, both of which Ward failed. Finally, at the police station, he registered .184 on the B.A.C. Datamaster breathalyzer.
There was a considerable amount of testimony regarding the lighting on and surrounding the sewer truck that night. Several witnesses for the State testified that the yellow sewer truck had a strobe light on the front, the hazard lights and headlights, the work light shining down in the manhole, and an arrow board on the back of the truck, all operating at the time of the collision. This is in addition to the street lights on Huffman. The State's witnesses included Garrett Lockett, one of the victims, Kathy and Edward Simpson, who were standing on the sidewalk watching the sewer workers when the accident occurred, the first police officer on the scene, two firemen and a medic.
On the other hand, several witnesses for the defense testified there were no lights on the sewer truck with the exception of maybe taillights and the work light shining into the hole. These witnesses included a neighbor who had exited her home just before the accident, two other neighbors who exited their home because of the sound of the impact, but who had a front view of the truck, and three men who drove up Huffman prior to the accident and claimed they almost hit the workers also. However, one of these men testified that he saw a flashing yellow light on the sewer truck. The defense admits that the lights were turned on at some point because the emergency workers who arrived on the scene minutes after the collision testified that they were illuminated upon their arrival. In this regard, one defense witness testified that he heard someone yell very shortly after the collision, "don't turn on your fuckin' lights now!" The defense argues this statement was directed toward the sewer workers, the State submits it was directed towards Ward.
Additional testimony was elicited from two defense experts, one discussing road construction and maintenance safety, and the other attacking the validity of the breathalyzer results from the B.A.C. Datamaster. The first expert, Alan Kundtz, examined the police reports and the pictures from the scene the night of the collision and concluded that the traffic controls used by the victims were "fairly inadequate" based on the recommendations of the Manual of Uniform Traffic Control Devices. He discussed at great length what traffic control devices should have been used, including advance warning signs four hundred feet from the work area and a series of cones beginning two hundred feet back from the work area, guiding traffic around the truck. He insisted that all of these advance warnings should have been used despite the fact that the job to be performed by the victims was only supposed to take a matter of seconds. During cross examination, Kundtz admitted that none of these traffic control devices are required, but are simply suggested.
The other defense expert, Larry Dehus, attempted to discredit the results of Ward's breathalyzer test by alleging that the machine was not functioning properly. He examined the calibration log of the machine and testified that the tests taken surrounding Ward's test were unstable. This instability, he submits, led to the machine's ultimate retirement about a month after this incident. In addition, he found the machine was plugged into the same outlet as a refrigerator which was not recommended in the manual. When examining Ward's actual breathalyzer results using the Widmark formula, Dehus found that for Ward to have registered a .184 on the B.A.C. Datamaster, he would have to have consumed thirteen beers within a three hour period. This conflicts with the testimony from Ward's coworkers that he only had two beers that night. However, during cross examination, Dehus admitted that he was not certified to operate nor calibrate the B.A.C. Datamaster, and that he used at least three average figures when calculating the Widmark formula for Ward.
Lastly, the state summoned Ward's niece, Heather Apple, who testified that her uncle was too drunk to drive that night and that she and his wife tried to talk him out of leaving. In fact, he attempted to take his three-year-old stepson with him when he left and Heather refused to allow him to leave with the child.
Based on our review of all of the evidence, we recognize the state and defense presented conflicting testimony regarding several aspects of the case. However, "in a manifest weight of evidence issue, we will not disturb the choice made by the trier of fact between credible witnesses and their conflicting testimony unless it is so incredible that it defies belief * * *" City of Fairborn v. Boles (May 15, 1998), Greene App. No. 97CA110, unreported, at p. 3. Apparently, considering the verdict, the jury chose to believe the state's witnesses and its version of events on that night. We do not find the state's case to be incredible, nor do we find that the evidence weighs heavily against a conviction. Based on the foregoing, we find that the jury's verdict was not against the manifest weight of the evidence. Accordingly, Ward's fifth assignment of error is overruled.
Judgment affirmed.
 _______________ BROGAN, J.
FAIN, J., and YOUNG, J., concur.